Filed 5/20/14

CERTIFIED FOR PUBLICATION


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re I.G., a Person Coming Under the Juvenile Court Law. | C073603 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> I.G., a Minor, etc., <br><br> Appellant. | (Super. Ct. No. 12 JV SQ 2950701) |


APPEAL from a judgment of the Superior Court of Shasta County, Molly A. Bigelow, Judge.  Reversed.

Donna Furth, under appointment by the Court of Appeal, for Appellant.

Rubin E. Cruse, Jr., County Counsel, and David M. Yorton, Jr., Deputy County Counsel, for Plaintiff and Respondent.


Fourteen-year-old I.G. was detained from her mother's custody due to her mother's substance abuse and failure to supervise.  I.G.'s father was in prison for attempted murder and did not make any arrangements for the minor's care.  I.G. proved

1

to be a challenge for the juvenile court and Shasta County Health and Human Services Agency (Agency). She was defiant and uncooperative, used illegal drugs, refused to attend school, was a frequent runaway and threatened to run away from any group home in which she was placed. The juvenile court sustained the Agency's petition, declared I.G. a dependent, found the parents had made no progress in overcoming the circumstances requiring out of home placement but, at the Agency's urging, returned I.G. to her mother's custody and terminated dependency jurisdiction.

I.G.'s counsel, with the assent of her guardian ad litem, appealed on I.G.'s behalf, contending the juvenile court erred in granting mother custody and terminating dependency because I.G. remained at risk and in need of supervision. We agree and reverse the juvenile court's orders returning the minor to her mother and terminating dependency jurisdiction.

BACKGROUND

I.G. was 14 years old when she came to the attention of the Agency in July 2012. She had just tested positive for THC (tetrahydrocannabinol), the active ingredient in marijuana, after giving birth to a premature baby. The Agency filed a petition under Welfare and Institutions Code section 300[1] on behalf of I.G.'s baby alleging I.G. and the baby's father were both using alcohol and illegal drugs, were assaultive toward each other and others, and had not been visiting the baby or learning how to care for her.[2] The allegations were found true and I.G. was provided reunification services, but she did not maintain contact with her attorney or the social worker.

---

[1]    Undesignated statutory references are to the Welfare and Institutions Code.

[2]    This court has taken judicial notice of the section 300 petition filed on behalf of I.G.'s baby, the subsequent jurisdiction and disposition orders, as well as certain orders after interim review and the order terminating I.G.'s parental rights in Shasta County case No. 12 JV SQ 2942501. (Evid. Code, § 452.)

In October 2012, the Agency discovered that I.G.'s mother was rarely home, using methamphetamine and abusing alcohol, and allowing drug users to frequent the home and sleep in the breezeway outside their home. Mother's whereabouts were unknown to I.G. and her siblings (ages 11, 12, and 17) much of the time. I.G., after one of her many arguments with mother, ran away and became homeless, was not attending school, and was using methamphetamine and marijuana. I.G. was physically aggressive at home, had a history of assaulting her mother and siblings and, on at least one occasion, assaulted and injured a sibling with a knife. Law enforcement had responded to the mother's residence on 28 occasions over the previous three years due to domestic disturbances and I.G. and her sister frequently running away. I.G.'s father was serving a lengthy term in prison in the State of Washington for attempted murder and possession of a firearm. The Agency filed a section 300 petition on behalf of I.G. alleging mother's neglect and father's failure to support, and alleging I.G. was suffering serious emotional damage, as reflected in her depression and aggression.

Mother moved out of the home and I.G.'s maternal grandmother moved in to care for I.G.'s siblings. I.G. told the social worker and her maternal grandmother that she could not live with her sister, O., and would refuse to follow rules, go to school and refrain from drugs if placed with the maternal grandmother. She said she wanted to "live wherever and be a kid." Finding I.G.'s presence destabilized the home, the juvenile court ordered her detained from parental custody and placed in a level 12 group home until she stabilized. The court counseled her that she may benefit from a structured living environment which would allow her to stabilize and help her overcome her addiction to drugs. I.G. retorted to the court, "It's going to make me leave and make me mad."

During her transport to the group home, I.G. jumped out of the vehicle and ran. She was later apprehended and placed with the maternal grandmother, despite the maternal grandmother indicating she was not willing to allow I.G. to live in the home.

The juvenile court sustained the allegations in the section 300 petition, making no further orders regarding I.G.'s placement.

After several months in the maternal grandmother's home, I.G.'s behavior improved and the Agency recommended the maternal grandmother serve as I.G.'s guardian. A few weeks later, however, the recommendation was recanted due to referrals for general neglect and concerns regarding mother staying in and using drugs in the garage. On one occasion, when police responded to a disturbance in the home, they discovered the maternal grandmother had not been home for two days. The police officer described I.G. as being aggressive and hitting people, acting erratically, and "being stupid." Although the social worker suggested the officer charge I.G. with assault and transport her to juvenile hall, the officer decided to attempt to calm the situation instead. The following day, I.G. was argumentative and defiant to visiting case workers.

On February 22, 2013, the Agency concluded, given I.G.'s lack of a stable caregiver, "it will likely be necessary for her to be moved to a more restrictive placement. No foster home has been identified that is able to care for her, and group home placements are being explored." I.G. was exhibiting behaviors that threatened her well-being; mother was not able to protect I.G.; father was incarcerated until 2042; and the maternal grandmother had been deemed an inappropriate guardian.

Four days later, the Agency filed an addendum stating: "Although the family dynamics are severely concerning . . . , all interventions have been unsuccessful. [I.G.] is highly defiant and the only placement resource available is an out of county group home. Even if [I.G.] was safely transported to such a facility, the likelihood of a runaway is great. The concern would then be an attractive young teen girl on the streets of an unfamiliar urban area, where her safety would be even at a greater risk than that of being in the care of her dysfunctional family. Based on the observed behavioral patterns of the mother, . . . coupled with [I.G.'s] strong dislike for her mother, reunification services are unlikely to assist the family in being healthier or happier. It is likely that if dependency is

4

dismissed, that the primary caregiver will again be the maternal grandmother and the mother will continue her inconsistent and addictive behaviors." The social worker indicated, however, that she was unable to locate the maternal grandmother. Nonetheless, the Agency's recommendation was that dependency be declared, custody given to mother, and dependency dismissed.

The juvenile court declared I.G. to be a dependent child of the court. The court found neither parent had made any progress toward alleviating or mitigating the causes necessitating placement, specifically finding mother continued to abuse illegal substances and failed to provide consistency or stability in parenting. The court further found that I.G. was a frequent runaway, that her use of illegal substances and oppositional, defiant, and assaultive behaviors made foster care unavailable to her, and that I.G. refused group home placement. After also finding that "mother . . . has agreed" that I.G. could live with the maternal grandmother, the court followed the Agency's recommendation, placed I.G. in mother's legal and physical custody, and terminated dependency jurisdiction.

Subsequently, I.G.'s reunification services and parental rights were terminated with respect to her baby, because she failed to (1) participate in services, (2) visit the baby, (3) eliminate the factors necessitating removal, and (4) maintain contact with the social worker or her attorneys.

DISCUSSION

The juvenile court has an equitable duty to protect the welfare of the children within its jurisdiction. (*In re Christopher I.* (2003) 106 Cal.App.4th 533, 557.) By enacting section 300, the Legislature intended to protect children who are currently being abused or neglected, "and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) Subsumed in that equitable duty is "a continuing responsibility to account for the welfare of a dependent child under its jurisdiction wherever placed, unless and until a permanent and stable home is established." (*In re Rosalinda C.* (1993) 16 Cal.App.4th 273, 279.)

5

Here, the juvenile court detained I.G. and found continuance in the home would be contrary to her welfare. Thereafter, the court concluded (1) allegations in the petition true, (2) I.G. fell within the juvenile court's jurisdiction as a child described by section 300, (3) the parents made no progress toward alleviating or mitigating the causes necessitating placement, and (4) I.G. is a dependent of the court. Then, contrary to all its findings, the court returned I.G. to her mother and terminated dependency. In doing so, it acted outside its statutory authority and abrogated its duty to protect I.G.

"If a child is adjudged a dependent child of the court on the ground that the child is a person described by Section 300, the court may make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child, including medical treatment, subject to further order of the court." (§ 362, subd. (a).)[3] Although the juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this

---

[3] California Rules of Court, rule 5.695, provides: "(a) Orders of the court (§§ 245.5, 358, 360, 361, 361.2, 390) At the disposition hearing, the court may:
  (1) Dismiss the petition with specific reasons stated in the minutes;
  (2) Place the child under a program of supervision as provided in section 301 and order that services be provided;
  (3) Appoint a legal guardian for the child;
  (4) Declare dependency and appoint a legal guardian for the child;
  (5) Declare dependency, permit the child to remain at home, and order that services be provided;
  (6) Declare dependency, permit the child to remain at home, limit the control to be exercised by the parent or guardian, and order that services be provided; or
  (7) Declare dependency, remove physical custody from the parent or guardian, and
    (A) After stating on the record or in writing the factual basis for the order, order custody to the noncustodial parent, terminate jurisdiction, and direct that *Custody Order--Juvenile--Final Judgment* (form JV-200) be prepared and filed under rule 5.700;
    (B) After stating on the record or in writing the factual basis for the order, order custody to the noncustodial parent with services to one or both parents; or
    (C) Make a placement order and consider granting specific visitation rights to the child's grandparents." (Original italics.)

6

discretion, such discretion is not unfettered and is subject to review for abuse. (*In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.)

It is a clear abuse of discretion to make findings that a minor is at risk in her home, yet return the minor home and terminate supervision and dependency. Furthermore, there are no statutory provisions authorizing such action.

When the juvenile court finds there is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means to protect the minor without removal, removal is provided for by section 361, subdivision (c)(1). Placement options for the minor are set forth in section 361.2, subdivisions (a) and (e). None of those options include placement with the still offending parent, especially one who is drug dependent, absent, and refusing services. And while mother purported to "agree" the minor could live with her maternal grandmother, the social worker's most recent report indicated the maternal grandmother was not suitable for placement.[4] Although unlikely, even if it is assumed the maternal grandmother, at some point, might become an appropriate relative caregiver under section 361.2, subdivision (k), supervision and dependency jurisdiction would necessarily be *continued*, not terminated. (See §§ 366, subd. (a)(1) [periodic review of dependent child in foster care]; 366.26, subd. (c)(4) [placement with relative caregiver at permanency planning hearing]; 366.27 [provides for permanent planned placement with relative caregiver]; 366.3, subd. (d) [status of minor

---

[4]    The social worker was no longer representing the maternal grandmother as a viable caregiver at the time of the disposition hearing. The social worker had, in the most recent reports, indicated that the maternal grandmother had not been consistent in her supervision of I.G. or her siblings, which had generated referrals of neglect and, therefore, requested placement of I.G. outside the maternal grandmother's home. The Agency also indicated at the disposition hearing that the social worker was unable even to *locate* the maternal grandmother and that guardianship was probably not feasible given her lack of supervision.

7

reviewed at least every six months when minor placed in home other than legal guardian].)

Even if the juvenile court could find, at some point, that there was *not* a substantial danger to I.G.'s physical health, safety, protection, or physical or emotional well-being if she were returned home, the juvenile court, having found the minor to be a dependent child, would still be required to continue supervision and dependency until such time as continued supervision was no longer necessary for the minor's protection. (§ 364.)

Nor was the juvenile court authorized to terminate dependency in this case in the interests of justice and for the welfare of the minor. Statutory authority for such action is limited. "A judge of the juvenile court in which a petition was filed, at any time before the minor reaches the age of 21 years, may dismiss the petition or may set aside the findings and dismiss the petition if the court finds that the interests of justice and the welfare of the minor require the dismissal, *and that the parent or guardian of the minor is not in need of treatment or rehabilitation*." (§ 390, italics added.) The juvenile court's factual findings that the parents had made no progress toward alleviating or mitigating the causes necessitating placement and that mother did not provide consistency or stability in parenting precludes any potential application of this unusual remedy.

We recognize that the Agency recommended, and the juvenile court implemented, this so-called "solution" because I.G. was threatening to run away from any placement other than placement with her maternal grandmother. But it is the juvenile court, not the dependent minor, who is charged with the statutory duty of making placement decisions in the minor's best interests. As I.G.'s counsel argued, "drop[ping] the [] system" and leaving the minor to manage her own protection and welfare is directly contrary to the obligation of the court to protect children adjudged dependents.[5]

---

[5]     The Agency argues I.G. "is not simply an obstinate minor," but "a street-wise minor/mother who has shown her ability to survive on her own and with her family. That

Unfortunately, this is not the first instance wherein a child protective agency and juvenile court, faced with an obstreperous child, essentially threw in the towel. Sacramento County was faced with similar circumstances in *In re Natasha H.* (1996) 46 Cal.App.4th 1151 (*Natasha H.*). Natasha's father had died when she was 12 years old and she was living with her mother -- a homeless heroin addict. (*Natasha H.*, *supra*, at p. 1153.) Natasha was left to live with friends and, when one such friend was unable to care for her, the friend reported the situation to law enforcement. Natasha, who was having difficulty in school and with following rules, was declared a dependent child of the court. (*Ibid.*)

Natasha became a habitual runaway from her foster and group home placements. (*Natasha H.*, *supra*, 46 Cal.App.4th at pp. 1153-1154.) She was not attending school and was arrested for burglary and possession of stolen property. (*Id.* at p. 1154.) After several years, the child protective agency recommended termination of the 16-year-old's dependency status based on the fact that she had been absent from her placement for two years and was uncooperative and resistant to placement, as she had run away from every placement, and her whereabouts were unknown. (*Ibid.*) The juvenile court found the child protective agency had endeavored to provide management and services but that it was clear that Natasha considered herself emancipated. Finding continued dependency to

---

is where she intends to be and that is what [the juvenile] court appropriately allowed and ordered." This is a stunning argument by counsel for a child protective service agency. We reject it out of hand. The record, to be sure, reflects a number of negatives. I.G. was a frequent runaway and a habitual truant. She continued to use illegal drugs during her teenage pregnancy. That may have led to the premature birth of a child she essentially abandoned. She had a history of violence against her siblings and in the presence of law enforcement. It is *this* behavior and *these* circumstances which have resulted from I.G. *being* in her mother's custody. Having been handicapped by poor parenting for years, I.G. has now been abandoned by the administration of child dependency justice and again left alone to attempt to manage her own well-being sensibly. Clearly, she cannot do it. Equally clearly, it is error for the Agency and the court to abdicate their legal duties in the face of it all, however apparently difficult.

9

be an " 'illusory act,' " the court terminated Natasha's dependency status and ordered her " 'remanded to her own custody at this time.' " (*Id*. at pp. 1154-1155.)

This court found the juvenile court in *Natasha H.* had exceeded its statutory authority in terminating Natasha's dependency status. (*Natasha H.*, *supra*, 46 Cal.App.4th at p. 1153.) There, as here, it was clear the minor remained in need of continued supervision, as her parents were unwilling or unable to do so. (*Id*. at p. 1157.) As we have said, we recognize the challenge of helping an obstreperous child, but "[a]lthough the minor's mother may retain legal custody, from the record it is apparent the minor remains in need of supervision. . . . Obstinacy and defiance test the patience of adults charged with the tending to the needs of minor children. Under the trial court's reasoning the more obstinate the child the greater the justification for terminating jurisdiction. We disagree. As much as the minor might wish to be rid of court supervision, and as frustrating as her conduct might be to [the social services agency] and the court, her misbehavior and lack of cooperation do not justify termination of her dependency status absent extraordinary circumstances not present here that make it in her best interest to do so."[6] (*Id*. at p. 1158, fn. omitted.)

Finally, we reject the Agency's attempt to distinguish I.G. from other minors, such as Natasha H., because she was also the minor-mother in a separate dependency case involving her premature baby. First, although a parent may *choose* to participate in proceedings, the court does not take jurisdiction of, or have authority to directly control, a

---

**6** We note, however, that the juvenile court may, instead, take jurisdiction over a minor as a " 'ward of the court' when the child is habitually disobedient or truant" under section 601, or commits a crime under section 602, if such jurisdiction is in the minor's best interest. (*D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1123; *In re Marcus G.* (1999) 73 Cal.App.4th 1008, 1012-1013; § 241.1.) When a minor is adjudged a ward of the court, the minor is subject to more restrictive placements because of his or her criminal conduct and the court may commit the minor to a juvenile home, ranch, camp, forestry camp, or juvenile hall. (*In re Donald S.* (1988) 206 Cal.App.3d 134, 137.)

10

parent in a dependency case.  (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1232; *In re Joshua G.* (2005) 129 Cal.App.4th 189, 202.)  Second, dependency statutes embody three primary goals for children adjudged dependents of the juvenile court:  (1) to protect the child; (2) to preserve the family and safeguard the parent's fundamental right to raise their child, as long as these can be accomplished with safety to the child; and (3) to provide a stable, permanent home for the child in a timely manner.  (*In re Santos Y.* (2001) 92 Cal.App.4th 1274, 1317.)  *None* of these goals are furthered by I.G.'s status as a mother in a separate dependency case.  And *none* of these goals were furthered by the juvenile court's order placing I.G. back with her mother and terminating dependency jurisdiction.

DISPOSITION

The juvenile court's orders returning the minor to her mother's custody and terminating the minor's status as a dependent child are reversed, and the matter is remanded for further proceedings.


      NICHOLSON     , Acting P. J.


We concur:


      HULL           , J.


      HOCH           , J.