Filed 12/11/14 In re K.R. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re K.R., a Person Coming Under the Juvenile Court Law. | B252942 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JESSICA P.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK00111) |

APPEAL from orders of the Superior Court of Los Angeles County. D. Zeke Zeidler, Judge. Affirmed.

M. Elizabeth Handy, under appointment by the Court of Appeal, for Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

Jessica P. (Mother) appeals from the juvenile court's dispositional orders terminating jurisdiction and granting custody of two of her children, A.M. and K.R., to their respective fathers.  We affirm the challenged orders.

**FACTS**

Mother has four children: son M.P., born in 2003 with Luis P.; daughter A.M., born in 2005 with Mauricio M.; daughter K.R., born in 2008 with William R.; and son B.P., born in 2012 with David P.  In 2013, Mother lived with David and B.P.  The older children did not live with Mother as a result of a voluntary placement plan Mother entered into in 2011.[1]  M.P. lived with the maternal grandmother and A.M. and K.R. lived with their respective fathers.  Each of the children visited with one another, generally at the maternal grandmother's home, and K.R. had an extended visit with Mother and David for approximately two weeks in June and July of 2013.

A petition under Welfare and Institutions Code[2] section 300 was filed on July 24, 2013, alleging David hit A.M. with belts, fondled K.R.'s vagina, and had a history of violent altercations with Mother in the presence of the children.  It was further alleged that Mother knew about the abuse, but failed to protect the girls.  The boys were alleged to be at risk of harm due to David's abuse and Mother's failure to protect.

---

[1]    On July 25, 2011, DCFS received a referral for general neglect and abuse.  During the course of the investigation, the children's social worker (CSW) observed M.P. and A.M. playing in the street while David sat on the porch drinking beer.  The CSW also noted that two-year-old K.R. was wandering around the house unsupervised while Mother, who was pregnant with B.P., slept on the couch.  The home also lacked hot water.  Mother agreed to allow K.R. and A.M. to live with their fathers while M.P. stayed with the maternal grandmother.  As a result of Mother's voluntary plan, the referral was closed and was never promoted to a case.

[2]    All further section references are to the Welfare and Institutions Code unless otherwise specified.

The petition was precipitated by a call from the Los Angeles Police Department (LAPD). On July 20, 2013,William brought K.R. to a LAPD station to report that David touched her vagina inside her underpants. K.R. told William and his girlfriend that David touched her several times between April and July 2013. K.R. also reported she witnessed David choking Mother in April 2013.

During the ensuing investigation, the Los Angeles County Department of Children and Family Services (DCFS) discovered that David had prior arrests for domestic abuse, battery, and possession of narcotics dating back to 1993. Both David and Mother denied all of the allegations. When confronted by the CSW about the allegations, Mother said, "Supposedly my boyfriend David [P.] touched my daughter [K.R.] on her vagina but I don't believe her! She came a month ago and said that David touched her through her panties. Her dad, William [R.] called me and told me that [K.R.] told him this." In an interview on July 21, 2013, A.M. told the CSW that David used to hit her with a belt when she stayed with Mother. She also witnessed David choking Mother and on another occasion, beating Mother. A.M. denied David touched her inappropriately. A.M. confirmed she felt safe in her father's care.

At the detention and arraignment hearing, the juvenile court found a prima facie showing had been made that the children were dependents described under section 300. B.P. and M.P. were detained in shelter care[3] and A.M. and K.R. were released to their fathers. DCFS was ordered to provide family reunification services and family maintenance services to all parties. Monitored visits were granted to Mother and David. However, they were ordered not to visit the children together and David was granted visits only with B.P.

DCFS made its jurisdiction/disposition report on August 29, 2013, documenting extensive interviews with the parties. In an August 23 interview, Mother indicated she believed K.R. lied about the sexual abuse because the accusation came two weeks after

---

[3]    Although M.P. lived with the maternal grandmother and she indicated she was willing to accept both M.P. and B.P. into her home, maternal grandmother's home was not initially approved because she had a previous referral against her.

Mother refused William's request to keep K.R. for a longer period of time and to reunite with him. William told her she was going to regret not keeping K.R. and not leaving David. David denied any sexual or physical abuse, also asserting the accusations stemmed from William. However, he believed William was motivated to coach K.R. because he wanted full custody and child support from Mother. David observed that K.R. was always with Mother, even when Mother was asleep or showering. He also stated, "She [K.R.] tends to lie a lot. She lies about everything." Both Mother and David indicated it was suspicious that William allowed K.R. to stay with them for two weeks during June and July after the alleged abuse began in April.

In an August 26, 2013 interview, K.R. confirmed, "David is my mom's husband and he touched my 'panito'[4] with his fingers." She also reported he touched her over her clothing and tried to kiss her on the mouth, but she said no, "because you don't do that." K.R. also reported seeing David and Mother fighting and hitting each other. William stated he waited approximately two weeks before reporting the abuse to the police because he "wanted to make sure first." When William confronted Mother about it, she told him they were all lies. However, William and his girlfriend confirmed the story with K.R. using a doll.

K.R. was interviewed over several days in September 2013 by a forensic case worker pursuant to court order. During this time, forensic interviewer confirmed K.R. knew the difference between what is true and what is not. K.R. then reiterated that David tried to kiss her on the mouth and touched her vagina. In addition, K.R. confirmed that David put his hands around Mother's neck, hit her "many times," and hit B.P.

DCFS noted some discrepancies in William and K.R.'s story regarding how and when the sexual abuse was disclosed. William stated K.R. initially told the babysitter about the abuse and the babysitter reported it to him. The babysitter, however, denied K.R. disclosed any abuse to her. Also, William provided inconsistent dates as to when K.R. first disclosed the sexual abuse, when he questioned Mother, and when he reported

---

[4] K.R. identified her vagina as "panito" and her buttocks as "nalgas."

the abuse to the police. K.R.'s story alternated between David touching her over her panties and under her panties.

As to the domestic violence allegations, DCFS noted that A.M. and K.R. consistently described incidents of domestic violence between Mother and David. In her interview, A.M. described how David hit her with a belt: "I was crying, I forgot why but I was crying really hard and my mom was inside with David in the room. Then he hit me with the belt on my bottom." Although Mother witnessed the incident, "[s]he didn't do anything." A.M. further recounted that David "hits my mom, one day he choked her. I don't remember why he choked her, but he put her on the wall and my mom went down and she was crying. That night, my mom was crying a lot. My brother [M.P.] was there but he was outside and I told him. David said that he was going to call the police so they can take my mom but I said that it was David that was supposed to go with the police." A.M.'s father indicated he wanted to retain custody of A.M. and was unaware of any abuse. Although both Mother and David deny any domestic violence occurred, DCFS noted that David's record showed past incidents of a violent nature. Additionally, other family members, including the other fathers, described David as violent or unpleasant. The children all reported that they were reluctant to have contact with David.

The CSW concluded, "Despite the inconsistencies in [William's] accounts of the child [K.R.'s] disclosure, the child maintains that [David] was fondling her vagina on a regular basis and also reported that [David] attempted to kiss the child in the mouth. Nonetheless, the mother and [David] uphold that all the allegations have been fabricated by [William] who is seeking to gain full custody of the child [K.R.]."

At the adjudication hearing on November 15, 2013, the juvenile court heard testimony from the CSW, K.R., and A.M., which conformed to the information provided in the DCFS reports. It also received stipulated testimony from Mother that she separated from David on the day of the detention hearing. She initially lived with the maternal grandmother, but then moved in with her friends once the maternal grandmother's home became a placement option. Mother also would have testified she was currently

participating in individual counseling and parenting. She would have denied that K.R. told her David touched her inappropriately or tried to kiss her.

The juvenile court adjudged the children to be dependents under section 300 and found by clear and convincing evidence that substantial danger existed to their physical and emotional health. As to A.M. and K.R., jurisdiction was terminated with custody orders granting legal and physical custody to their respective fathers. Weekly monitored visits were granted to Mother as to all the children. However, Mother and David were not to visit together. No reunification services were offered to David as to M.P. and B.P. Mother was provided reunification services for B.P. and M.P. and individual counseling was ordered for M.P. as needed. The court further ordered K.R. to attend counseling until a therapist indicated it was no longer needed. The court indicated Mother was not granted services as to K.R. and A.M. because K.R. and A.M. were safely in the care of another parent. In any case, the juvenile court noted that Mother would receive services in B.P. and M.P.'s case. Twice monthly sibling visitation was also ordered. The court expressly noted and overruled Mother's objection to the dispositional order terminating jurisdiction as to K.R. Mother's counsel argued the DCFS reports showed William did not adequately protect K.R., there remained a substantial risk to K.R., and jurisdiction should be maintained to ensure her safety. Mother timely appealed.

## DISCUSSION

Mother does not dispute the juvenile court's findings. She only challenges the juvenile court's dispositional orders relating to K.R. and A.M. According to Mother, substantial evidence demonstrates a need for continued jurisdiction over both girls, particularly since the court maintained jurisdiction over B.P. and M.P. Additionally, Mother argues it is in the children's best interests to preserve the family with Mother. County Counsel filed a respondent's brief contending the juvenile court's orders as to A.M. were proper, but it took no position on the court's orders as to K.R. since DCFS recommended continued jurisdiction over K.R. William also filed a respondent's brief, arguing substantial evidence supports the juvenile court's orders as to K.R. Because the

6

girls are differently situated, we separately address whether the court's orders as to each of them were proper.

## I.     Applicable Law and Standard of Review

Mother assumes the juvenile court applied section 361.2, subdivision (b)(1)[5] when it granted custody of the girls to their fathers and terminated jurisdiction.  William agrees with Mother that section 361.2 applies because "[K.R.] was technically living with Father [William] at the time the proceedings were initiated in juvenile court, however there was no custody order in place with either the family law court or the juvenile court.  [K.R.] had overnight visitation with Mother, in the home she resided in with David, and [K.R.] was abused during such visitation in Mother and David's home.  Thus, the incidents which brought this matter to the attention of the juvenile court occurred during a time when [K.R.] was 'residing with Mother and David, not Father [William]."  County Counsel likewise cites to sections 361.2 and 362.4[6] as the governing law in this case. The juvenile court, however, did not reference section 361.2 or 362.4 in its orders.

---

[5]     Section 361.2, subdivision (a) provides that when a court assumes jurisdiction of a minor, it must determine "whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300, who desires to assume custody of the child." If so, the court must place the child with that parent unless it finds that doing so poses a risk of harm to the child. (§ 361.2, subd. (a).)  Once the child has been placed with the noncustodial parent, the court has three options:  (1) it may simply terminate jurisdiction and give the noncustodial parent legal and physical custody of the child with visitation rights to the other parent (§ 361.2, subd. (b)(1)); or (2) it may place the child with the noncustodial parent and order a home visit be conducted within three months to determine whether that parent should have permanent custody (§ 361.2, subd. (b)(2)); or (3) it may order reunification services be provided to either or both parents and determine at a later hearing which parent, if either, shall have custody of the child (§ 361.2, subd. (b)(3)).

[6]     Section 362.4 provides, in pertinent part, "[w]hen the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court prior to the minor's attainment of the age of 18 years, and . . . an order has been entered with regard to the custody of that minor, the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child.  [¶] . . . [¶]  If no action is filed or pending relating to the custody of the minor in the superior court of

7

By its own terms, the options outlined in section 361.2 govern only when the dependent child is placed with a parent "with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of Section 300[.]" Here, the girls resided with their fathers at the time the proceedings were initiated. K.R.'s two-week stay with Mother and David in June and July 2013 was merely an extended visit. Although Mother and William agreed that no custody orders were issued by any court regarding K.R. and A.M., it is clear the girls lived with their fathers and, at a minimum, the fathers shared custody of the girls with Mother. Under the Welfare and Institutions Code, the residence of a minor is determined by the residence of the person who has custody of the child. (§ 17.1, subd. (b).) Under this scenario, the girls resided with their fathers prior to the proceedings and therefore, could not have been placed under the terms of section 361.2.

Although this case does not fit neatly within its parameters, we nevertheless believe the juvenile court derived its powers from sections 362 and 364. (*See In re A.L.* (2010) 188 Cal.App.4th 138 [applying section 362 to adjudge a child a dependent of the court, but leaving her in parental custody as part of the dispositional order]; *In re Gabriel L.* (2009) 172 Cal.App.4th 644 [applying section 364].) Section 362 permits a juvenile court to "make any and all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child" if he or she is adjudged a dependent of the court under section 300. (§ 362, subd. (a).) Section 364 outlines the procedure when a court has determined that jurisdiction under section 300 is appropriate, but "the child is not removed from the physical custody of his or her parent or guardian . . . ." (§ 364, subd. (a).) "After hearing any evidence presented by the social worker, the parent, the guardian, or the child, the court shall determine whether continued supervision is necessary. The court shall terminate its jurisdiction unless the social worker or his or her

any county, the juvenile court order may be used as the sole basis for opening a file in the superior court of the county in which the parent, who has been given custody, resides. The court may direct the parent or the clerk of the juvenile court to transmit the order to the clerk of the superior court of the county in which the order is to be filed."

8

department establishes by a preponderance of evidence that the conditions still exist which would justify initial assumption of jurisdiction under Section 300, or that those conditions are likely to exist if supervision is withdrawn." (§ 364, subd. (c).) When proceeding under section 364, the juvenile court is not concerned with reunification, but with determining whether continued supervision is necessary in the family home because the child is in placement with a parent and the existing custody arrangement is not disrupted. (*In re Gabriel L., supra,* 172 Cal.App.4th at p. 650.)

Whether we apply section 361.2 or sections 362 and 364, the standard of review is abuse of discretion. (*In re Gabriel L., supra,* 172 Cal.App.4th at p. 647 [court's discretion under section 364 is similar to the court's broad discretion as to whether to offer services under section 361.2 because in both situations the child is not in out-of-home placement, but in placement with a parent.] Furthermore, the juvenile court's factual findings are reviewed for substantial evidence. (See, e.g., *In re Austin P.* (2004) 118 Cal.App.4th 1124, 1134 [appellate court reviewed record for substantial evidence indicating whether there was a need for continuing supervision].)

This standard of review comports with the juvenile court's "broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion." (*In re Jose M*. (1988) 206 Cal.App.3d 1098, 1103-1104; *In re I.G.* (2014) 226 Cal.App.4th 380, 386.) Thus, we may not reverse the juvenile court's dispositional orders in the absence of a clear abuse of discretion.

## II.    K.R.

Mother contends the juvenile court erred in terminating jurisdiction as to K.R. because there was sufficient evidence in the record to indicate that continued supervision was needed to ensure K.R. was protected. In support of her position, Mother emphasized William's domestic abuse history, pointing to her own statements to DCFS describing how William hit her and abused alcohol during their relationship. The family entered into a voluntary family maintenance contract from December 2008 to November 2009 after Mother reported that William slapped Mother. Mother reported it was an isolated

incident and William denied it happened. Mother also highlights the inconsistencies in his story about learning of K.R.'s abuse as well as his delay in reporting it. Mother contends William may not be committed to caring for K.R. because he asked to extend K.R.'s visit with her and he would often call Mother at 11 p.m., asking if she could take care of K.R. "because he wanted to go out and have fun." According to Mother, these, along with the fact that K.R. was four years old and had not yet started therapy, were all factors favoring continued jurisdiction over K.R. In short, "[t]he question remained whether William R. should have permanent custody of [K.R.] and the case closed before it could be assured that William R. would follow through with therapy, and [K.R.'s] emotional health needs were known to the court."

We find the juvenile court acted within its broad discretion to terminate its jurisdiction over K.R. Mother and David were the sole cause of the dependency proceedings. There were no allegations relating to William. Instead, the jurisdiction/disposition report noted that an inspection of William's one-bedroom home with K.R. showed it to be in adequate condition, with working utilities, and appeared free of clutter. The inspector observed sufficient food, toys, and clothing in the home. The CSW concluded, "At this time, the child appears stable in the care of her father." K.R. also liked living with William, stating, "It's good, I sleep well." William denied living with anyone else and having any other children.

Further, William completed parenting classes and counseling due to the voluntary family maintenance contract in 2008 and 2009. There is no indication that domestic violence continues to be an issue for William. Mother's suggestion that William is not committed to K.R. is belied by the fact that K.R. has lived with him since 2011 without any problems. William has provided for K.R. during this time and ensured she continued to have visits with Mother and her siblings. He enrolled K.R. in preschool at Jefferson Elementary School and made an appointment for a mental health evaluation of K.R. As to the delay in reporting David's abuse of K.R., William explained that he did not want to make such serious accusations until he was sure they were true.

10

Mother's reliance on *In re Austin P.* (2004) 118 Cal.App.4th 1124, is misplaced. There, the non-custodial father took custody of his son under section 361.2 after he was removed from the mother's home. At the review hearing, the court refused to terminate jurisdiction, finding that continued supervision was necessary for several reasons: the father knew his son was being abused but had taken no steps to protect him and without continuing jurisdiction, the boy's safety could not be assured; father had sporadic contact with his son during the past 10 years and the child was more bonded with his mother; there was significant conflict between the parents; the social worker believed the boy needed both individual and conjoint therapy with each parent, which could occur only if the matter remained open; and the mother was making good progress with her reunification plan. (*Id.* at p. 1134.) The father appealed, contending the dependency court should have terminated jurisdiction. The appellate court affirmed, finding substantial evidence to support a finding that continued supervision was necessary, thus precluding the termination of jurisdiction. (*Id.* at p. 1135.)

Contrary to Mother's contention, similar facts do not exist here. Unlike *In re Austin P.,* there is no question as to K.R.'s safety because the conditions which justified assumption of jurisdiction under section 300 no longer exist since K.R. is no longer in contact with David. Moreover, there is no indication William is not willing or able to protect K.R. He reported the abuse soon after he learned about it and he did not allow David contact with K.R. after the initiation of the proceedings. He also has an established bond with K.R., who likes living with him, and has provided an adequate home for her. Further, the juvenile court ordered individual counseling for K.R., not joint counseling with either parent. There is no indication William will not ensure K.R. receives counseling. He has already made an appointment for a mental health evaluation for K.R. While there may be evidence which shows continued supervision may be beneficial in this case, the juvenile court did not make an arbitrary, capricious, or patently absurd determination in terminating jurisdiction.

11

## III.    A.M.

Having determined that no abuse of discretion occurred in terminating jurisdiction over K.R., we find even less reason to find the juvenile court abused its discretion in terminating jurisdiction over A.M.  We are persuaded by the analysis in *In re A.J.* (2013) 214 Cal.App.4th 525, which found the juvenile court properly exercised its discretion in terminating jurisdiction after placing the dependent child out of state with her biological and presumed father.  The juvenile court's finding that no protective issue existed which would warrant retaining jurisdiction was supported by substantial evidence.  (*Id.* at p. 536.)  The juvenile court found the father to be a committed, responsible parent who could provide a stable, loving, and safe home for the child, and who had taken the necessary steps to see that the child would receive all the services, education, and health care that she needed.  (*Id.* at pp. 539-540.)

A.M. has likewise been provided "a stable home and loving home" by her father, Mauricio, since 2011.  She has an established bond with him and he wishes to retain custody of her.  A.M. reports that Mauricio's girlfriend, with whom they live, treats her well.  The CSW noted that she appears to be well adjusted in Mauricio's home.  A.M. was not abused by David; therefore, she does not require therapy.  There is nothing in the record to indicate A.M. requires continued supervision.

Mother has not presented any evidence of a need for continued supervision, arguing instead that it is in A.M.'s best interest to maintain a relationship with Mother and her siblings.  It is clear, however, that Mauricio has provided ample opportunity for A.M. to continue a relationship with Mother and the siblings.  He regularly brings A.M. to maternal grandmother's home for visits.  The juvenile court properly exercised its discretion when it terminated jurisdiction over A.M. after placing her with Mauricio.

**DISPOSITION**

The dispositional orders relating to A.M. and K.R. are affirmed.


                                    BIGELOW, P.J.

We concur:


        RUBIN, J.


        FLIER, J.