Filed 10/27/15  In re I.G. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

| | |
|---|---|
| In re I.G., a Person Coming Under the Juvenile Court Law. | C078248 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES,<br><br>          Plaintiff and Respondent,<br><br>     v.<br><br>K.T.,<br><br>          Defendant,<br><br>I.G.,<br><br>          Appellant. | (Super. Ct. No. 12JVSQ2950701) |

This is minor I.G.'s second appeal in this case.  In the first appeal, we reversed the juvenile court's orders returning I.G. to her mother's custody and terminating I.G.'s

1

status as a dependent child.  (*In re I.G.* (2014) 226 Cal.App.4th 380, 390.)  Once again, I.G.'s counsel, with the assent of her guardian ad litem, has appealed on I.G.'s behalf, contesting the termination of dependency jurisdiction.  We reverse the juvenile court's orders.

BACKGROUND

We judicially notice our prior opinion and adopt and incorporate by reference the facts from that opinion, which discuss events leading up to the detention of the then 14-year-old minor in October 2012, through to the disposition hearing at which the juvenile court returned her to mother's custody and terminated dependency jurisdiction in February 2013.  (Evid. Code, §§ 452, 459; *In re I.G.*, *supra*, 226 Cal.App.4th at pp. 383-385.)  In our opinion filed on May 20, 2014, we reversed the juvenile court's orders returning I.G. to her mother's custody and terminating I.G.'s status as a dependent child, and remanded for further proceedings.  The remittitur issued on July 22, 2014.

The record is silent about what happened while the first appeal was pending.  The initial hearing on remand was held on August 12, 2014.  The juvenile court ordered the Shasta County Health and Human Services Agency (Agency) to make every effort to locate I.G.  On August 14, 2014, mother (K.T.) and I.G. went to Vancouver, Washington, along with other family members, for a wedding.  After the wedding, the maternal grandmother left with the rest of the family, leaving mother, I.G., and one of I.G.'s sisters behind.

Mother, I.G., and I.G.'s sister began living at the Share Orchards Inn shelter in Vancouver, Washington, on August 22, 2014.  The juvenile court issued a protective custody warrant for I.G.

On October 1, 2014, the shelter reported that mother was participating in services through the shelter and had obtained a part-time job at a grocery store.  The shelter reported that mother was maintaining sobriety, although she had not undergone any substance abuse testing except for the test she took prior to obtaining her job.  I.G. was

2

enrolled in school on September 3, 2014, but although she had been enrolled for 20 days, there were 10 days (38 classes) where she was absent without an excuse, and she was tardy on eight days (nine classes). Mother appeared by telephone at the October 7, 2014, review hearing. The matter was continued to October 15, 2014.

Mother and I.G. were physically present for the October 15, 2014, hearing. The juvenile court set a contested dispositional hearing, which took place on November 4, 21, and 25, 2014. The Agency filed a disposition report stating that mother, I.G., and I.G.'s sister were living in a church in Redding for shelter. Mother had reported to the social worker that they were attending Narcotics Anonymous (NA) meetings at the church, but testified in November that she was not attending NA or Alcoholics Anonymous (AA) meetings. At another point during her testimony, mother stated she was "receiving outpatient treatment for [her] addictions." Mother was looking for a job. She reported she last used methamphetamine in August 2014 and underwent a drug test at the social worker's request on October 22, 2014, which came back negative. The results of a second test on November 13, 2014, were pending. Mother had relapsed by getting drunk one weekend in October 2014. Before that, she reported she had not had alcohol since August 2014. She had been to one anger management class, which she sought out without the Agency's assistance. The only service for which the Agency had submitted referrals was for drug and alcohol assessments for mother and I.G.

I.G. had been previously diagnosed with depression and attention deficit hyperactivity disorder (ADHD). She also had anger management problems, but was not currently taking prescription medication and had not received any anger management counseling. Mother's last physical altercation with I.G. was "at least six months" ago. Mother could not get I.G. a medical appointment because there was a six-month waiting list. Mother stated that she is unable to stop I.G. from using marijuana, which I.G. reported made her feel better. I.G. stated she had not used methamphetamine since August. She had, however, continued to use marijuana while in Washington. She was

3

enrolled in school in Shasta County but had been suspended for having a pipe and marijuana in her backpack. She was subsequently charged with possession of marijuana on school property and referred to juvenile probation. She was also subsequently expelled from school for having cough syrup.

The Agency recommended terminating dependency jurisdiction over the then 16-year-old I.G., stating that it did not feel that interfering with the family's attempts to restabilize together would benefit I.G. On November 25, 2014, at the conclusion of the disposition hearing, the juvenile court found mother and I.G. had been "doing well together" in Washington and the court did not want "these proceedings to interfere with that," so if they decided to return to Washington, the court would "strongly entertain terminating the dependency." In the meantime, as they were planning to stay in Shasta County, the court ordered that I.G. remain a dependent and be placed with mother on a plan of family maintenance. The Agency was ordered to prepare a case plan.

The Agency filed a case plan on December 18, 2014. The case plan acknowledged that both mother and I.G. had severe substance abuse problems and required mother to participate in a drug and alcohol assessment and comply with subsequent treatment recommendations, that she stay free from illegal drugs and cooperate with random drug testing, and that she maintain a stable residence and comply with court orders. The case plan required I.G. to complete a mental health assessment with Shasta County Mental Health and comply with subsequent treatment recommendations, that she participate in medical appointments and take psychotropic medications as prescribed, that she complete a drug and alcohol assessment and comply with required treatment or testing, that she stay free from illegal drugs, that she attend school regularly, and that she actively participate in the Shasta County Youth/Peer Court program to which she had been referred as part of her juvenile probation referral.

On January 8, 2015, the Agency filed a section 388 petition for modification of the disposition order, asking the juvenile court to terminate dependency jurisdiction. In

4

support of the petition, the Agency alleged mother and I.G. were homeless and mother was concerned that her homelessness would cause her to revert to drug use. Mother had family support in Washington and she hoped to get her old job back. The Agency had purchased one-way bus tickets for mother and I.G. to travel there on January 11, 2015. Over I.G.'s objection, the juvenile court provisionally granted the Agency's request to send mother and I.G. on the bus to Washington, and set a contested hearing on the section 388 petition.

The contested hearing took place on January 16, 2015. Mother reported that she was looking for a job. I.G. testified that, although she had not wanted to return to Washington, she did not want to move again to go back to Shasta County. She reported that she and mother were living with her aunt but that it was a temporary situation and they would only be allowed to live there for a month. There was also evidence presented that, prior to leaving for Washington, I.G. had been participating and was compliant in a Youth Violence Prevention Council in connection with her juvenile probation and had been scheduled to participate in related anger management and substance abuse services through the program when she left.[1]

The Agency argued that there were no existing child welfare issues, that it was the return to Shasta County from Washington that caused the problems for mother and I.G., and that they should be allowed to stay in Washington and jurisdiction should be terminated. The juvenile court found that mother had been establishing her independence

---

[1] It appears I.G. was under the "dual jurisdiction" of both dependency and delinquency courts. The record does not indicate whether a joint assessment pursuant to Welfare and Institutions Code section 241.1 and California Rules of Court, rule 5.512 was scheduled or undertaken. (Further undesignated statutory references are to the Welfare and Institutions Code). Upon remand, these statutorily required procedures must be followed promptly.

and had previously done well in Washington. Finding no child safety problems, it gave custody of I.G. to mother and terminated dependency.

## DISCUSSION

I.G. contends it was error for the juvenile court to grant the section 388 petition for modification and terminate dependency jurisdiction. We agree. Having found the minor to be a dependent child, the juvenile court was required to continue supervision and dependency until such time as continued supervision was no longer necessary for the minor's protection. (*In re I.G., supra,* 226 Cal.App.4th at p. 387; § 364.) Likewise, it could not grant the section 388 petition without determining it is in the best interests of the minor. (§ 388; *In re Jasmon O.* (1994) 8 Cal.4th 398, 414-419.) Here, the required standards were not met.

The termination of jurisdiction in this instance was based on the speculative and fallacious conclusion that returning mother and I.G. to Washington was a return to stability. While this may have been *the hope* of the Agency and the juvenile court, it was not factually supported by the record.

First, the premise (relied upon by the Agency in making its recommendation for termination of jurisdiction) that mother and I.G. had achieved stability while previously in Washington was exaggerated. They had only been there two months. While mother had purportedly obtained a part-time job and reported having ceased methamphetamine use since her arrival, she had undertaken only a single drug test and was in the very beginning stages of her recovery. And while I.G. was enrolled in a mainstream school, she had actually *attended* less than half of the 20 days she had been enrolled. I.G. also reported having ceased methamphetamine use, but she continued to use marijuana illegally. And I.G. had not obtained any professional or medical assistance with her anger management, depression, and ADHD problems. As such, while mother and I.G.'s status in Washington may have included some preliminary signs of progress, it did not establish a state of stability.

Moreover, reports that mother's and I.G.'s move back to Shasta County was the demise of their stability were also exaggerated. The Agency repeatedly states that their return caused them to become homeless, but mother and the minors were living in a shelter in Washington, and moved into a church shelter upon their return. And, notably, after their return, the Agency failed to provide any meaningful services to mother or I.G. to assist them in gaining stability.

More significant to the determination of whether jurisdiction should be terminated than the two months of purported progress mother and I.G. had made while in Washington, was mother's report to the Agency that she was concerned that being homeless would cause her to revert back to drug use. Despite this information, the Agency and the juvenile court sent them back to Washington, without a stable home, without services in place, without supervision or monitoring, and simply terminated jurisdiction.

In making this order, the juvenile court acknowledged that mother had obtained a job when she had previously been in Washington and that it was "clear that the mother and [I.G.] had difficulty maintain housing, . . . sobriety and also employment here. And the mother chose, which a protective mother would choose, . . . to return to a place of stability, and this mother took her child and returned to that place of stability which is in the state of Washington. *It is truly the Court's hope that mom can resume the stability she had in the state of Washington by obtaining housing, by obtaining her former employment . . . and that she can assist her child in maintaining substance free*." (Italics added.) After noting that I.G. had been enrolled in a mainstream school when she had previously been in Washington, but had been in a continuation school in Shasta County, the juvenile court remarked: "[B]ut [I.G.] was mainstreamed in Washington, and she was doing well, *and I hope for [I.G.] that she can get back to that*." (Italics added.)

A juvenile court cannot terminate dependency jurisdiction based on "hope" and speculation. Not only had stability not been *established* when mother, I.G., and I.G.'s

7

sister had been in Washington before, it most definitely had not been established at the time of the hearing. It had not even begun. They had been back in Washington for less than a week. Mother, who began using drugs and alcohol at age 12, had been self-reportedly methamphetamine-free for only five months, and had abused alcohol only three months earlier. Yet, there was no evidence she was participating in treatment or services. I.G. had no mental health, substance abuse, or anger management assistance. There was no evidence I.G. was enrolled in school and mother did not have a job or stable housing. In fact, mother and I.G. had but a few weeks before they would possibly become homeless again -- a condition mother had previously reported could cause her to revert to substance abuse.

There were several options available for the juvenile court to consider that would have provided I.G. the protection to which she was entitled. Although the Agency had provided little to no services during the time mother and I.G. were in Shasta County, I.G. had recently begun to receive services through the Youth Violence Prevention Council in connection with her juvenile probation. The juvenile court could have allowed her to continue to participate in the anger management and substance abuse services through that program. It could have ordered the Agency to provide relapse prevention services for mother, along with the other services under the case plan to both mother and I.G. And the Agency could have assisted mother in finding suitable housing.

Even if the juvenile court determined that mother's relocation to Washington was the most beneficial course for the family, it could have allowed mother to do so without abandoning its protection of I.G. The juvenile court could have permitted mother to move to Washington, given her time to obtain stability and *then, after adequate investigation* by Shasta County social workers or any other suitable agency, placed the minor in her custody. Or at the very least, the juvenile court could have allowed mother and I.G. to move to Washington under continued supervision to assure I.G.'s safety.

8

Effective January 1, 2013, California Rules of Court, rule 5.616 (Interstate Compact on the Placement of Children (ICPC)) provides in pertinent part:

"(g) Placing a Child With an Out-of-State Parent (Fam. Code, §§ 7901, art. 5(b), and 7906; ICPC Reg. No. 2, § 3)  When a child will be placed with his or her parent in another state, compliance with the requirements of the ICPC is not required.  *However, the court has discretion to take the steps it deems necessary to ensure the child's safety and well-being in that placement*.  Those steps may include:

"(1) Directing the child welfare agency to request an independent, non-ICPC home study or courtesy check;

"(2) Directing the child welfare agency to enter into a contract with a public or private agency in the receiving state to obtain a home study or other needed information;

"(3) Directing the child welfare agency to enter into an informal agreement with a public or private agency in the receiving state, or requesting a courtesy check from such an agency, to obtain needed information; or

"(4) Any other steps that the court deems necessary to ensure the child's safety and well-being."  (Cal. Rules of Court, rule 5.616, italics added.)

The Agency argues that child protection services in Washington stated they refused to "get involved" because I.G. was not in "imminent danger."  The social worker's report, however, states they did agree to do a courtesy check but that they needed an ICPC or an "immediate safety concern[]" to become involved.  Thus, an ICPC could have been done if the Agency needed assistance with services or supervision from Washington social workers.

" 'Interstate compacts, like the ICPC, "are formal agreements among and between states that have the characteristics of both statutory law and contractual agreements. . . ." [Citation.]'  [Citation.]"  (*In re C.B.* (2010) 188 Cal.App.4th 1024, 1031.)  " ' "The purpose of the ICPC is to facilitate cooperation between participating states in the placement and monitoring of dependent children.  [Citation.]" '  [Citation.]"  (*Id.* at

9

p. 1032.) "While . . . ICPC compliance is not required for an out-of-state placement with a parent, nothing in the ICPC prevents the use of an ICPC evaluation as a means of gathering information before placing a child with such a parent. . . . [¶] The ICPC also permits a sending public agency to enter into a voluntary agreement with 'an authorized public or private agency in the receiving state' for the performance of services related to the case by the agency in the receiving state. [Citations.] In some situations, the Agency may be able to monitor the situation from California. [Citation.] '[S]tates differ as to whether they will . . . provid[e] courtesy supervision services. . . . Th[is] point[s] out the need for early and ongoing communication with the social services agency in the receiving state as to what they will and will not do in a given case. All parties should ensure that such communication is taking place and that [the] necessary information is received before important decisions impacting on the child's welfare are made.' [Citation.]" (*In re John M.* (2006) 141 Cal.App.4th 1564, 1572.)

Regardless of the difficulty of allowing mother to return to Washington with the goal of obtaining stability while maintaining appropriate supervision, one option *not* available to the juvenile court was to send mother and I.G. off with a one-way bus ticket. Once the juvenile court declared the minor a dependent child, it was required to continue supervision and dependency until such time as it was no longer necessary for the minor's protection. This minor came to the attention of the Agency in 2012, when she was 14 years old. She is now 17 years old and has yet to receive the services the Agency set forth in her case plan. Delay, caused by difficult case avoidance by the Agency, repeatedly terminating jurisdiction, and leaving this troubled family, especially the minor, to their own devices, is not in the best interests of this minor. The juvenile court must order the appropriate supervision and services be provided, and the Agency must comply with those orders.

# DISPOSITION[2]

The juvenile court's order terminating the minor's status as a dependent child is reversed.  The juvenile court is directed to hold a review hearing within 14 days of the date remittitur issues.

                                               NICHOLSON     , Acting P. J.

We concur:


      HULL            , J.


      HOCH           , J.

---

[2]     In support of her position that the juvenile court's order terminating jurisdiction be reversed, I.G. filed a motion to consider additional evidence which became available after the juvenile court entered its order.  We deny I.G.'s request to consider additional evidence.  Similarly, we also deny respondent's related motion to take additional evidence.  (Code Civ. Proc., § 909.)