Filed 10/13/15  In re Annie B. CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re ANNIE B.,<br><br>a Person Coming Under the Juvenile Court Law. | B260957<br><br>(Los Angeles County<br>Super. Ct. No. CK39716) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>CHRISTOPHER B.,<br><br>     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Philip L. Soto, Judge.  Affirmed in part and reversed in part.

Patti L. Dikes, under appointment by the Court of Appeal, for Defendant and Appellant.

Mark J. Saladino, County Counsel, Mary C. Wickham, Interim County Counsel, Richard D. Weiss, Chief Deputy County Counsel, Dawyn R. Harrison, Assistant County Counsel, and David Nakhjavani, Deputy County Counsel, for Plaintiff and Respondent.

## INTRODUCTION

Christopher B., the presumed father of 11-month-old Annie B., appeals from the juvenile court's jurisdictional findings and disposition order declaring his daughter, who was born with a positive toxicology screen for methadone and suffered methadone withdrawal symptoms, a dependent of the court pursuant to Welfare and Institutions Code section 300, subdivision (b),[1] and placing the child with him under the supervision of the Los Angeles County Department of Children and Family Services (Department), with family maintenance services, on condition he reside with Annie's paternal grandmother. At the time of Annie's birth, Christopher and Annie's mother, Julie B., were lawfully using methadone under a doctor's supervision to treat their Vicodin addiction. Christopher contends neither current use of legally prescribed methadone nor his and Julie's history of substance abuse constituted sufficient evidence to justify the juvenile court's exercise of jurisdiction over Annie. He also contends, even if jurisdiction was proper based on Julie's use of methadone during her pregnancy and her past abuse of opiates and methamphetamine, the juvenile court abused its discretion in ordering the child be placed with him under the Department's supervision, rather than terminating its jurisdiction with a family law custody order. We agree the evidence was insufficient to sustain the allegations in the section 300 petition concerning Christopher but otherwise affirm the findings and orders of the juvenile court.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *Julie's Prior Involvement with the Dependency System*

Julie has acknowledged a more than 20-year history of illicit drug use including opiates and methamphetamine and has lost custody of two children through the

---

[1]     Statutory references are to the Welfare and Institutions Code.

dependency system during that time. In May 2000, the juvenile court sustained a petition under section 300, subdivision (b), concerning her 18-month-old son, finding her "use of drugs place[d] the minor Conor at risk of harm and create[d] a detrimental home environment." (The Department initiated the case after Julie, then homeless, left three-month-old Conor in a bar.) The juvenile court declared Conor a dependent of the court, removed him from the custody and care of Julie and his father (not Christopher), who was incarcerated, and placed Conor with a paternal aunt. The juvenile court returned Conor to Julie approximately one year later, and terminated its jurisdiction in November 2001.

The Department filed a second dependency petition in January 2008 relating to Conor and his four-month-old half brother Charlie based on allegations of domestic violence between Julie and Charlie's father (not Christopher). In addition, the juvenile court found Julie had been using methamphetamine and again sustained allegations under section 300, subdivision (b), regarding her drug use. Thereafter, Julie was not compliant with court-ordered services. In March 2009, the juvenile court terminated jurisdiction as to Charlie, and awarded his father sole legal and physical custody. A year later, in March 2010, the juvenile court terminated parental rights of Julie and Conor's father, and Conor's paternal aunt adopted him.


**B.** *Annie's Birth with a Positive Toxicology Screen for Methadone*

Annie was born in early October 2014 with a positive toxicology screen for methadone and was suffering withdrawal symptoms. Julie also tested positive for methadone at the time of Annie's birth. Annie spent several weeks in the hospital while her withdrawal symptoms were treated with morphine.

Two days after Annie's birth, the Department received a referral regarding the newborn. A children's social worker interviewed Julie, Christopher, and Annie's paternal grandmother. Julie explained she used methadone as a means of withdrawing from Vicodin, which had initially been prescribed for her four years earlier to treat her fibromyalgia. The methadone treatment was administered through the Aegis Treatment

3

Centers (Treatment Center) in Simi Valley. Julie reported she had stopped using opiates when she learned she was pregnant, sometime in January or February 2014. She said she had been seen by a doctor for prenatal care in New York when she was 11 weeks pregnant and then again starting two weeks prior to Annie's birth in Los Angeles. Although Julie was seen by a physician through the Treatment Center, the clinic did not provide prenatal care.

## C. *The Section 300 Petition*

The Department filed a section 300 petition on behalf of Annie on October 29, 2014. The petition alleged pursuant to subdivision (b)[2] of that section that Annie was born with a positive toxicology screen for methadone and was hospitalized and received treatment due to withdrawal as a result of unreasonable acts by her mother, who had a positive toxicology screen for methadone at the child's birth. It further alleged, "The child's father Christopher B[.] knew of the child's mother's illicit drug use and failed to take action to protect the child. Further, the child's mother's use of illicit drugs and the father's failure to protect the child endanger the child's physical health and safety, placing the child at risk of physical harm, damage and danger." (Count b-1.)

In a separate count under section 300, subdivision (b), and a parallel count under subdivision (j) (abuse of sibling), the Department alleged Julie had a 20-year history of

---

[2]     Section 300, subdivision (b)(1), provides in pertinent part:
"Any child who comes within any of the following descriptions is within the jurisdiction of the juvenile court which may adjudge that person to be a dependent child of the court: [¶] . . . [¶] . . . The child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, or the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left, or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse."

4

illicit drug use including opiates and methamphetamine that rendered her incapable of providing Annie with regular care and supervision and had used opiates and methadone during her pregnancy. In addition, the count alleged Annie's sibling Conor had received permanent placement services due to Julie's substance abuse. (Counts b-2 and j-1.)

Finally, again pursuant to section 300, subdivision (b), the petition separately alleged Christopher had a history of substance abuse including hydrocodone and methadone and "is a current abuser of methadone which renders the father incapable of providing the child with regular care and supervision." Christopher's "substance abuse," according to the count, "endangers the child's physical health and safety, placing the child at risk of physical harm, damage and danger." (Count b-3.)

## D. *The Juvenile Court's Findings and Orders*

At the detention hearing, after finding Christopher to be Annie's presumed father, the juvenile court found the Department had established a prima facie case to detain Annie from Julie. The juvenile court ordered Annie placed in the custody of Christopher upon her release from the hospital on condition Christopher continue to live with Annie's paternal grandmother, stay in his program and maintain his sobriety. The juvenile court ordered monitored visitation for Julie with discretion in the Department to liberalize the visits. The juvenile court also ordered the Department to consider developing a section 301 contract[3] with the family, as well as closure of the case with a family law custody order.

In its jurisdiction/disposition report for the December 12, 2014 hearing, the Department stated Annie was residing with Christopher in the paternal grandmother's home, was doing well medically, appeared to have no serious ongoing effects from her prenatal exposure to methadone and was developing at a rate normal for a two-month-old infant. The Department also reported, "Father is providing care for the child and mother

_____

[3]     A section 301 contract is a program of informal supervision for a family in lieu of a formal finding of dependency and juvenile court supervision.

is coming to the home on a daily basis to assist father with this care and supervision. Both parents appear to be strongly bonded to the child and the paternal grandmother has indicated that the parents have been appropriate with the child at all times. At this time it would appear that this home is safe for the child and there are no issues or detriments in his home."

With respect to the allegations in the petition, the Department reported Julie acknowledged in interviews she had an ongoing problem with the use and abuse of drugs including opiates and methamphetamine, which had led to the loss of her two older children. The records obtained by the Department indicated Julie has an extensive drug-related criminal history, including most recently a conviction for possession of a controlled substance in June 2013.

Julie explained she began methadone treatment to deal with her Vicodin addiction prior to the birth of Annie and insisted she was committed to living a drug-free life and providing all necessary care for her daughter. Julie was aware Annie would test positive for methadone at birth, but was under a doctor's care throughout the methadone treatment program and had been told by medical personnel the child would not be adversely affected by her use of methadone. The Department's report attached a letter from Lital Shvarts, Psy. D., clinical manager at the Treatment Center, which described the clinic as an outpatient facility specializing in treatment of opiate dependence. Dr. Shvarts's letter stated Julie was currently enrolled in an outpatient methadone maintenance treatment program, which she began on July 22, 2014, and confirmed she "was treated with the recommended dose for pregnancy" as prescribed by the program's physician. The letter noted that Julie was required to be seen daily for medication services and once weekly for individual counseling services. It concluded by stating, "It is recommended that [Julie] continue with treatment and gradually taper off the methadone."

For his part, Christopher told the Department's social worker he was aware Julie had been using methadone under a doctor's supervision to treat her Vicodin addiction. Both he and Julie had been told there would be no negative effects to the child as a result of this treatment. Christopher acknowledged that he, too, had been addicted to Vicodin

6

used for back pain and was currently being treated under a doctor's supervision at the Treatment Center in a methadone program.

In his evaluation of the family's current situation, the Department's social worker noted both parents have lengthy drug histories and have only recently begun to address those issues. The social worker also observed that Julie and Christopher "seem to be committed to turning their lives around" and "the parent[s'] age also provides some hope that they have now matured to a point where they understand their past mistakes and how these mistakes have negatively affected themselves and those around them." The report recommended Annie be made a dependent child of the juvenile court, explaining the Department "believes that this family would continue to benefit from both [Department] and court services as they continue to care for this very young child and deal with their longstanding drug issues."

The juvenile court received the Department's reports at the jurisdiction and disposition hearing; no additional evidence was submitted. Christopher argued for dismissal of the petition in its entirety or, at least, that the allegations concerning him (part of count b-1 and all of b-3) be dismissed, contending his past history of substance abuse was not a ground for jurisdiction and his current use of methadone was pursuant to a doctor-supervised treatment plan. He was employed as a bail bonds agent and was providing appropriate care for Annie, who had been in his custody since her discharge from the hospital. Julie's counsel joined in Christopher's arguments; Annie's counsel urged the juvenile court to sustain the section 300 petition and declare the child a dependent of the court.

With respect to disposition, because the juvenile court had indicated it was inclined to deny services to Julie, as recommended by the Department, Christopher asked that the case be terminated with a family law custody order for him. He contended he was already in a program through the Treatment Center, receiving counseling and drug treatment services, and, therefore, additional court-ordered services were unnecessary. Alternatively, he asked that the juvenile court issue a home-of-parents order allowing both parents to retain custody of Annie under the Department's supervision.

The juvenile court sustained the section 300, subdivision (b), allegations in the petition regarding both Julie and Christopher and declared Annie a dependent of the court.[4] The juvenile court removed Annie from Julie's custody, placed her with Christopher on condition he continue to reside with the paternal grandmother, ordered family maintenance services for Christopher and denied services to Julie pursuant to section 361.5, subdivision (b)(10). Julie's visitation was to continue to be monitored except for visits in placement if the paternal grandmother was in the home.

At the six-month review hearing (§ 364) on June 11, 2015, the juvenile court terminated its earlier home-of-father order (and with it the condition that Annie and Christopher reside in the home of her paternal grandmother) and ordered Annie placed in the home of both parents under the supervision of the Department.[5] The juvenile court ordered the Department to provide both Christopher and Julie with family maintenance services. The next review hearing is scheduled for December 10, 2015.

## DISCUSSION

### A. *The Governing Statute and Standard of Review for Jurisdictional Findings*

Through the dependency law, the Legislature intended "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm." (§ 300.2.) The legislature has expressed that "[t]he provision of a home

---

[4] The court apparently overlooked the additional allegations under section 300, subdivision (j), which, as discussed, simply repeated count b-2 as to Julie; it neither sustained nor dismissed those allegations.

[5] We granted the Department's unopposed request to take judicial notice of this order.

8

environment free from the negative effects of substance abuse is a necessary condition for the safety, protection and physical and emotional well-being of the child." (*Ibid.*)

A child may be declared a dependent of the juvenile court when that child is described by section 300. A child falling within subdivision (b)(1) of that section is one who "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse. . . ." (§ 300, subd. (b)(1).) A true finding under subdivision (b)(1) requires the Department to demonstrate "(1) neglectful conduct by the parent in one of the specified forms; (2) causation; and (3) 'serious physical harm or illness' to the minor, or a 'substantial risk' of such harm or illness." (*In re Rocco M.* (1991) 1 Cal.App.4th 814, 820.)

"Subdivision (b) means what it says. Before courts and agencies can exert jurisdiction under section 300, subdivision (b), there must be evidence indicating that the child is exposed to a *substantial* risk of *serious physical* harm or illness." (*In re Rocco M.*, *supra*, 1 Cal.App.4th at p. 823.)

"Although section 300 generally requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing (*In re Savannah M.* (2005) 131 Cal.App.4th 1387, 1396 . . . ; *In re Rocco M.*[, *supra*,] 1 Cal.App.4th [at p.] 824), the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child (*In re N.M.* (2011) 197 Cal.App.4th 159, 165 . . .). "The court may consider past events in deciding whether a child presently needs the court's protection. (*Ibid*.) A parent's '"[p]ast conduct may be probative of current conditions" if there is reason to believe that the conduct will continue.' (*In re S.O.* (2002) 103 Cal.App.4th 453, 461 . . . .)" (*In re Christopher R.* (2014) 225 Cal.App.4th 1210, 1215-1216.)

"In a challenge to the sufficiency of the evidence to support a jurisdictional finding, the issue is whether there is evidence, contradicted or uncontradicted, to support the finding. In making that determination, the reviewing court reviews the record in the

light most favorable to the challenged order, resolving conflicts in the evidence in favor of that order, and giving the evidence reasonable inferences. Weighing evidence, assessing credibility, and resolving conflicts in evidence . . . are the domain of the trial court, not the reviewing court." (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)

**B. *Substantial Evidence Supports the Jurisdictional Findings as to Julie***

Julie has a significant substance abuse history including drug-related arrests and convictions. Although she made efforts to treat her addiction after she learned she was pregnant through participation in a methadone program, that continued drug use, even if otherwise lawful, endangered her child, who not only tested positive for methadone but also experienced withdrawal symptoms for several weeks. In addition, while Julie's use of methadone was apparently supervised by a physician who opined the dosage being administered was safe for her unborn child, the record reflects she failed to obtain prenatal care while using methadone until the final two weeks of her pregnancy. This evidence fully supports the juvenile court's findings that Julie's past and current drug use justified the exercise of dependency jurisdiction over Annie.

Relying primarily on *In re Drake M.* (2012) 211 Cal.App.4th 754, Christopher argues Julie's lawful use of methadone is drug use, not drug abuse, and, standing alone, cannot support a jurisdiction finding. (See *id.* at p. 764 ["without more, the mere usage of drugs by a parent is not a sufficient basis on which dependency jurisdiction can be found"].) But this is hardly a case of "without more." Julie is not using medical marijuana, as was the father in *Drake M.* She is addicted to opiates and apparently has been for many years. She has switched, at least for now, from Vicodin[6] to prescribed synthetic opiates (methadone) as part of a drug addiction detoxification program. But she

_____

[6]     Julie told the Department a doctor prescribed Vicodin for her four years ago. She also told the Department she did not have the contact information for the doctor. It is unclear how Julie was obtaining Vicodin given that the medication was prescribed years ago.

remained addicted; no gradual tapering off had occurred as of the date of the jurisdiction hearing. And that addiction and continued drug use caused substantial harm to her child, conduct plainly falling within the ambit of section 300, subdivision (b).

Moreover, Julie's addiction and ongoing use of opiates easily satisfies the definition of "substance abuse" in the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (4th rev. ed. 2000) (DSM-IV-TR), which the *Drake M.* court found persuasive (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766), as well as the more recent and more broadly defined classification of "'substance use disorders,'" which combines substance abuse and dependence, in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5), which this court discussed in *In re Christopher R.*, *supra*, 225 Cal.App.4th at page 1218, footnote 6. Notwithstanding the loss of her two older children because of her use of controlled substances and her conviction in mid-2013 of a drug-related offense, Julie continued to use/abuse opiates until she became pregnant with Annie and then, rather than elect other possible forms of treatment, entered a methadone program. This plainly constitutes "'continued substance use despite having persistent or recurrent social or interpersonal problems caused or exacerbated by the effects of the substance . . . .' (DSM-IV-TR, p. 199.)" (*In re Drake M.*, *supra*, at p. 766.) Additionally, it is reasonable to infer from Julie's history and self-reported "very bad withdrawals" when she tried to stop using opiates on her own, that she experienced cravings to use the substance, engaged in persistent use despite the knowledge that it caused physical or psychological problems, suffered withdrawal symptoms and, because of substance use, she failed to fulfill major role obligations, qualifying as at least a moderate substance use disorder under DSM-5. (See *In re Christopher R.*, *supra*, at p. 1218, fn. 6.)

**C.** *The Evidence Is Insufficient To Support the Jurisdictional Findings as to Christopher*

Christopher contends no evidence was presented to the juvenile court he in any meaningful way "failed to take action to protect the child" from Julie's medically

prescribed use of methadone or that his own history of substance abuse or current methadone treatment endangered Annie's physical health or safety. We agree. Although dependency jurisdiction over Annie is justified, Christopher is a nonoffending parent.[7]

### 1. *Failure to Protect*

The Department alleged in count b-1 of the petition that Christopher failed to protect Annie prior to her birth. The Department argues Christopher "failed to ensure [Julie] received prenatal care," "showed no concern about Annie's well-being," and "appeared to have no knowledge of [Julie] attending substance abuse treatment programs, narcotics anonymous meetings, or about Annie's prenatal care." Relying on *In re J.C.* (2015) 233 Cal.App.4th 1, 6, the Department asserts Christopher's "knowledge of [Julie's] drug use and drug-related history, and his failure to protect his unborn child, supported jurisdiction."

---

[7] "[A] jurisdictional finding good against one parent is good against both. More accurately, the minor is a dependent if the actions of either parent bring her within one of the statutory definitions of a dependent. [Citations.] This accords with the purpose of a dependency proceeding, which is to protect the child, rather than prosecute the parent. [Citation.]" (*In re Alysha S.* (1996) 51 Cal.App.4th 393, 397; accord, *In re I.A.* (2011) 201 Cal.App.4th 1484, 1491; see *In re Alexis H.* (2005) 132 Cal.App.4th 11, 16.) Accordingly, the findings relating to Julie provide sufficient grounds for affirming the declaration of dependency as to Annie. (See *In re I.A.*, *supra*, at p. 1491 ["[a]s a result of this focus on the child, it is necessary only for the court to find that one parent's conduct has created circumstances triggering [§] 300 for the court to assert jurisdiction over the child"]; *In re P.A.* (2007) 155 Cal.App.4th 1197, 1212.) Nonetheless, we agree with Christopher's argument the challenged jurisdictional findings relating to him may have adverse consequences in this or subsequent proceedings and, therefore, consider the merits of his appeal of those findings: "[W]e generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.*, *supra*, 211 Cal.App.4th at pp. 762-763; see *In re I.C.* (2015) 239 Cal.App.4th 304, 310-311; *In re Quentin H.* (2014) 230 Cal.App.4th 608, 613.)

With regard to Christopher's alleged failure to ensure prenatal care, there is little in the record concerning Julie's prenatal care other than her lack of it. There is nothing in the evidence suggesting Christopher's actions prevented Julie from obtaining prenatal care, or that he otherwise encouraged Julie to avoid such care. (Cf. *In re J.C.*, *supra*, 233 Cal.App.4th at p. 5.) In fact, there was some evidence Christopher was actually supportive of Julie's minimal prenatal care efforts because he attended two prenatal care visits with her.[8]

The evidence also does not support the Department's claim Christopher had no concern for Annie's well being such that Annie was at risk of serious physical harm because of it. Christopher believed Julie was "trying her best" and had gone to the clinic because she was pregnant. Christopher reported Julie was attending Narcotics Anonymous meetings and a drug treatment program. Christopher knew that Julie's methadone use was medically supervised and Julie "had been under the care and supervision of a doctor the entire time." Christopher's defensive and poorly-phrased statement Annie's withdrawal was "normal" and "not a big deal" was related to Christopher's expectations from medical staff at the Treatment Center. Christopher had been informed by the Treatment Center that Annie would test positive for methadone, but there would "be no negative effects to the child."

The Department's reliance on *In re J.C.*, *supra*, 233 Cal.App.4th 1 as support for jurisdiction based on Christopher's conduct for his alleged failure to protect is misplaced. *In re J.C.* addressed whether jurisdiction as to a father could be sustained because he failed to protect his child from a mother's drug use during her pregnancy. Division Eight of this court answered in the affirmative where "instead of taking steps to stop mother's drug use," a "father instead abetted and encouraged" the drug use. (*Ibid.*) A father abets and encourages where he actively engages in drug use with a mother during her pregnancy. (*Ibid.*)

---

[8] As Julie had only two weeks of prenatal care, it appears Christopher may have attended most, if not all, of Julie's prenatal care visits.

13

These circumstances are distinctly different from those of *In re J.C.* Here, Christopher did not abet and encourage Julie to use illicit drugs. He did the opposite. Christopher and Julie both were actively involved in addressing their Vicodin dependency issues through their medically supervised use of methadone. Julie sought methadone treatment on a physician's recommendation after learning she was pregnant. Christopher thought Julie was "trying her best" and was legitimately addressing her substance abuse issues. Christopher had been advised "there would be no negative effects to the child in regards to [Julie's] use of methadone."

Christopher's acts are not consistent with a failure to protect Annie prior to her birth. His prenatal actions do not support a finding that he caused serious physical harm or illness to Annie or that he put her at substantial risk of such harm or illness. The juvenile court's jurisdictional finding that Christopher "knew of [Julie's] illicit drug use and failed to take action to protect the child" is not supported by substantial evidence. (Count b-1.)

2. *Substance Abuse*

In count b-3, the petition alleged Christopher had a history of substance abuse, was a "current abuser of methadone," and "incapable of providing [Annie] with regular care and supervision." The Department argues the juvenile court's jurisdictional findings as to Christopher were supported by substantial evidence because Christopher "admitted he started using Vicodin to treat back pain and was now under methadone treatment because he was trying to stop his addiction and wean himself off of the drug." The Department's assertion, however, does not address evidence supporting how Christopher's medically-supervised use of methadone exposes Annie to risk of serious harm or illness because of his inability to supervise, protect or care for Annie as required by section 300, subdivision (b)(1).

To be sure, the record establishes that Christopher was a user of methadone. There is a dearth of evidence in the record, however, concerning anything specific about Christopher and his use of methadone or how he allegedly abused it. The only evidence

14

of Christopher's methadone use came directly from Julie and Christopher. They both admitted that Christopher became addicted to Vicodin after taking it for back pain, and he was participating in a medically-supervised methadone program to eliminate his Vicodin dependency issues. The plan, according to Christopher, was to gradually reduce his level of methadone until he no longer needed it.

The Department did not present any other evidence concerning methadone generally and Christopher's use of it. While the Department submitted letters from the program about Julie's participation in the program, it did not present any such evidence concerning Christopher. The Department did not interview or speak to anyone at the program about Christopher's participation. There is nothing in the record explaining the effect of methadone on Christopher. The juvenile court had no evidence concerning the program at Treatment Center generally, its requirements, the extent and quality of Christopher's participation in treatment, and the amount of methadone Christopher was prescribed and currently using.

Substantial evidence does not support the juvenile court's finding Christopher "was a current abuser of methadone." To meet its burden of proving Christopher had a substance abuse problem, the Department could have relied on (1) evidence from a "medical professional" that Christopher "had been diagnosed as having a current substance abuse problem" (see *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766); (2) the factors set forth in the DSM-IV-TR[9] defining substance abuse or those defining substance

9    "The full definition of 'substance abuse' found in the DSM-IV-TR describes the condition as "[a] maladaptive pattern of substance use leading to clinically significant impairment or distress, as manifested by one (or more) of the following, occurring within a 12-month period: [¶] (1) recurrent substance use resulting in a failure to fulfill major role obligations at work, school, or home (e.g., repeated absences or poor work performance related to substance use; substance-related absences, suspensions, or expulsions from school; neglect of children or household)[; ¶] (2) recurrent substance use in situations in which it is physically hazardous (e.g., driving an automobile or operating a machine when impaired by substance use)[; ¶] (3) recurrent substance-related legal problems (e.g., arrests for substance-related disorderly conduct)[; and ¶] (4) continued substance use despite having persistent or recurrent social or interpersonal problems

15

abuse disorder in the more recently published DSM-5[10] (*In re Drake M.*, *supra*, at p. 766; *In re Christopher R.*, *supra*, 225 Cal.App.4th at p. 1218, fn. 6); or (3) evidence of ongoing drug use resulting in an inability to supervise or protect Annie thereby placing her at substantial risk of harm (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1025). The Department, however, did not pursue any of those options.

The Department did not present any evidence concerning Christopher that related to the DSM-IV-TR factors. Nothing in the record supports a finding Christopher failed to fulfill his work or home obligations. There was no evidence Christopher engaged in physically dangerous activities while under the influence of drugs. Christopher's criminal record did not reveal substance-related legal problems. Finally, nothing suggested Christopher had social or interpersonal problems caused by drug use.

The lack of evidence related to Christopher and the DSM-5 factors was similar. The Department did not present any evidence Christopher presently suffered from cravings or an intense desire to use drugs as the Department presented no specific information about Christopher's ongoing treatment. Nothing suggested Christopher spent large amounts of time getting, using or recovering from his use of methadone or that he was failing at any of his obligations.

Additionally, the Department did not present any evidence suggesting Annie was at risk of substantial harm because of an inability to supervise, protect or care for the

---

caused or exacerbated by the effects of the substance (e.g., arguments with spouse about consequences of intoxication, physical fights).' (DSM-IV-TR, p. 199.)" (*In re Drake M.*, *supra*, 211 Cal.App.4th at p. 766.)

10      In *In re Christopher R.*, *supra*, 225 Cal.App.4th at page 1218, footnote 6, we explained the more broad "'substance use disorders'" defined in the DSM-5: "DSM-5 identifies 11 relevant criteria, including cravings and urges to use the substance; spending a lot of time getting, using, or recovering from use of the substance; giving up important social, occupational or recreational activities because of substance use; and not managing to do what one should at work, home or school because of substance use. The presence of two or three of the 11 specified criteria indicates a mild substance use disorder; four or five indicate a moderate substance use disorder; and six or more a severe substance use disorder. [Citation.]"

child because of Christopher's use of methadone.[11]  In fact, the evidence established that Christopher functioned quite well and was able to properly care for Annie even with his medically-supervised use of methadone.  The Department never detained or requested the juvenile court remove Annie from Christopher's care.  Annie was released from the hospital into Christopher's care in the paternal grandmother's home as recommended by the Department in its detention report.  The Department informed the juvenile court Christopher was providing care for Annie and he had been appropriate with her.  Annie was bonded to Christopher.  The Department assessed Christopher's home as "safe" for Annie with "no issues or detriments in his home."[12]  According to the Department, Christopher's care of Annie "appear[ed] to be working well for the parties involved."

The juvenile court had no evidence before it that Christopher was currently a substance abuser as alleged in the petition.  The Department did not present medical testimony on the issue or any other evidence that would support the juvenile court's jurisdictional finding that Christopher "is a current abuser of methadone."  The Department also presented no evidence that Christopher was unable or incapable of providing care for Annie because of his use of methadone.  Accordingly, the juvenile court's finding to the contrary is not supported by substantial evidence and must be reversed.  (Count b-3.)

## D. *The Court's Retention of Dependency Jurisdiction While Christopher Received Services Was Not an Abuse of Discretion*

Christopher argues that even assuming there was substantial evidence to support the juvenile court's jurisdiction based only on Julie's substance abuse issues, "the

---

[11]  As it did not establish Christopher was a substance abuser, the Department cannot rely on Annie's "'tender years'" as prima facie evidence Christopher was unable to care for Annie.  (See *In re Drake M.*, *supra*, 211 Cal.App.4th at p. 767.)

[12]  Christopher and Annie were then residing in the home of the paternal grandmother.

17

juvenile court abused its discretion in failing to terminate jurisdiction with a family law custody order at disposition." Christopher correctly notes section 362.4 allows the juvenile court to terminate its jurisdiction "over a minor who has been adjudged a dependent child of the juvenile court" and to issue "an order determining the custody of, or visitation with, the child." (§ 362.4.)

"The juvenile court has an equitable duty to protect the welfare of the children within its jurisdiction. [Citation.] By enacting section 300, the Legislature intended to protect children who are currently being abused or neglected, 'and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm.'" (*In re I.G.* (2014) 226 Cal.App.4th 380, 386, quoting Welf. & Inst. Code, § 300.2.)

"'The juvenile court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accordance with this discretion. [Citations.] The court's determination in this regard will not be reversed absent a clear abuse of discretion. [Citation.]'" (*In re Neil D.* (2007) 155 Cal.App.4th 219, 225, quoting *In re Jose M.* (1988) 206 Cal.App.3d 1098, 1103-1104.) "A court exceeds the limits of legal discretion if its determination is arbitrary, capricious or patently absurd." (*In re N.M.*, *supra*, 197 Cal.App.4th at p. 171.) The test for an abuse of discretion is whether the juvenile court's order exceeded the bounds of reason. (*In re Alexandria M.* (2007) 156 Cal.App.4th 1088, 1095-1096.)

At the time of disposition, the juvenile court expressed its concerns that Julie and Christopher had not resolved their drug dependency issues and that their treatment was ongoing. The court noted, "just because they are in programs doesn't mean the risk has been eliminated." Julie and Christopher's ongoing drug treatment, the possibility of relapse, and Annie's age, the juvenile court reasoned, were grounds for ongoing juvenile court supervision.

At the time of the disposition hearing, Annie was only two months old. The juvenile court was well within its discretion when it made a disposition order placing Annie in Christopher's care under the Department's supervision. While Julie and

Christopher were addressing their issues in their program, neither Julie nor Christopher had completed the program. Despite their commitment to completing the program, the juvenile court recognized the possibility of relapse.

The juvenile court's concerns were well supported by the facts. Julie had a long established and significant history of substance abuse. She had lost her two older children through the dependency system because of her substance abuse issue. Julie did not begin her treatment program until July 22, 2014, less than three months before Annie was born. While Julie voiced a commitment to treatment, her relatively brief period of medically-supervised use of methadone did not eliminate the potential risk of harm to Annie.

The juvenile court's concerns about Christopher were similarly justified. Christopher had admitted his Vicodin dependency issues and had sought methadone as a way to eliminate his dependence on the drug. While Christopher argues he had enrolled in programs he needed for his rehabilitation, he had not completed the programs. His treatment was ongoing. That Christopher had enrolled in a substance abuse treatment program and was participating in it did not eliminate the risk of potential harm to two-month-old Annie.

Moreover, Julie and Christopher were an extant couple. They lived together and planned to live with Annie as a family. Christopher told the Department he wanted "to be left alone so [he and Julie] can move forward with 'their lives and the baby.'" Any disposition ordered by the juvenile court had to consider and account for Julie and Christopher's circumstances as a family unit.

Given the juvenile court's justifiable concern about Julie's contact with two-month-old Annie as well as Julie and Christopher's need for ongoing treatment, its decision not to terminate jurisdiction with a family law custody order in favor of Christopher was well reasoned and appropriate. A family law custody order would not have resulted in any kind of oversight of Annie's placement. Enforcement of such an order would require Christopher to take action in family court assuming he had the motivation to do so. There would have been no social worker or juvenile court

19

involvement to ensure Julie and Christopher remained on track with their treatment and were actively eliminating the conditions that led to Annie's dependency. (§ 362, subd. (d).) Most significantly, nothing would have been in place to protect Annie if her parents decided not to abide by the terms of the family law custody order or complete their treatment. Under these circumstances, there was nothing arbitrary, capricious or patently absurd in the juvenile court making an order placing Annie in Christopher's care under the Department's supervision.

## DISPOSITION

The jurisdictional findings as to Christopher are reversed. In all other respects the juvenile court's findings and disposition order are affirmed.


BECKLOFF, J.[*]


We concur:


ZELON, Acting P. J.


SEGAL, J.

---

[*]     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.